IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

NOV − 7 2019

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.

XIZHI LI,
a/k/a "Juan Lee,"
a/k/a "John Lee,"
a/k/a "Francisco Ley Tan,"
a/k/a "Francisco Ley,"
a/k/a "Z,"
a/k/a "Juan Lee Gonzalez,"
a/k/a "Juan Francisco Lee Gonzalez,"
a/k/a "Juan Francisco Lee,"
a/k/a "John Vallejo Lee,"
a/k/a "Juan Li,"
a/k/a "Xi Zhi Li"
a/k/a "Hsi Chih Li,"
a/k/a "Ah Chih,"
a/k/a "A Zhi,"

JIANXIANG CHEN,
a/k/a "John Chen,"
a/k/a "John,"
a/k/a "Big Brother Heng,"
a/k/a "Hanguo,"

GEORGE SHAO MIN YU,
a/k/a "Ah Wen,"
a/k/a "Old man,"

        Defendants.

**(UNDER SEAL)**

CRIMINAL NO. 1:19-CR-334

Count 1:    Conspiracy to Distribute
            Five Kilograms or more of
            Cocaine
            (21 U.S.C. §§ 841 & 846)

Count 2:    Conspiracy to Distribute
            Five Kilograms or more of
            Cocaine, Knowing and
            Intending it will be Unlawfully
            Imported into the United States
            (21 U.S.C. §§§ 959, 960, 963)

Count 3:    Conspiracy to Commit Money
            Laundering
            (18 U.S.C. §1956(h))

Forfeiture Notice: 18 U.S.C. § 982;
                   21 U.S.C. §§ 853 & 970

**INDICTMENT**
November 2019 TERM - at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

**GENERAL ALLEGATIONS**

*THE CONTROLLED SUBSTANCES ACT*

At all times relevant to this Indictment:

1.    Having determined that "[t]he illegal importation, manufacture, distribution and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people[,]" Congress enacted the Controlled Substances Act (CSA), 21 U.S.C. § 801, *et seq.*

2.    There are five "schedules" of controlled substances, known as Schedule I, II, III, IV, and V.  Substances are "scheduled" depending on their potential for abuse and recognized medical usage.  For example, a drug listed in Schedule II has a high potential for abuse but also has an accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.  21 U.S.C. § 812, *et seq.*

3.    Cocaine is a narcotic drug listed in Schedule II.  21 U.S.C. §§ 802(17)(D) & 812.

4.    Per the CSA, no person may, without authorization, knowingly or intentionally manufacture, distribute or dispense, or possess with the intent to manufacture, distribute or dispense a controlled substance, or conspire or attempt to do the same.  21 U.S.C. §§ 841 & 846.

5.    The CSA has extraterritorial application.  Specifically, it reaches acts of distribution and manufacture of Schedule I and II controlled substances, and conspiracies to do the same, that occur outside the United States when such acts are undertaken with the knowledge and intent that they will result in the unlawful importation of Schedule I and II controlled substances into the United States.  21 U.S.C. §§ 959 & 963.

### MONEY LAUNDERING

6.    It is unlawful to conduct or attempt to conduct a financial transaction affecting in any degree interstate or foreign commerce involving the proceeds of a "specified unlawful activity," knowing that the property involved in the financial transaction represents some form of unlawful activity and knowing that the transaction was designed in whole or in part to conceal or

disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, or to conspire to do the same. 18 U.S.C. §§ 1956(h) & (a)(1)(B)(i).

7.      Violations of the CSA involving the felonious importation, receiving, buying, selling or otherwise dealing in controlled substances are a "specified unlawful activity" for purposes of the prohibitions outlined in 18 U.S.C. § 1956(a). 18 U.S.C. §§ 1956(c)(7), 1961(1)(D).

### THE ECONOMY OF INTERNATIONAL COCAINE TRAFFICKING

8.      The United States is one of the world's largest and most lucrative markets in which to distribute illegal drugs including, but not limited to, cocaine.

9.      The overwhelming majority of the cocaine consumed in the United States is produced in South America in countries like Colombia, Bolivia, and Peru.

10.      The process of transporting cocaine out of South America and importing it into the United States is complex and generally involves numerous organizations and individuals. The price of cocaine continually increases along this supply chain, culminating at the point of sale to users in the United States.

11.      This trade generates enormous illicit profits in the United States in the form of U.S. Dollars. For this criminal business to continue and achieve its purpose, it is necessary for a portion of this money to be repatriated to the foreign drug trafficking organizations (DTO) that manufactured and distributed the cocaine in Latin America, and ultimately brought the cocaine into the United States. However, because this money is the proceeds of a "specified unlawful activity," special care and skill has to be taken to transact it to avoid detection by law enforcement.

12.      Simultaneously, there is a large demand for U.S. Dollars and U.S. merchandise around the world including, though not exclusively, in China. There is also a high demand for Chinese currency, known as yuan or remnbi (RMB), among Latin American merchants, including

those in Mexico, seeking to purchase Chinese goods to sell for profit. As a result, individuals with connections to "black market merchants" in China, and foreign, often Mexican, DTOs and merchants are well situated to profit by servicing these parallel demands.

### TRADE BASED MONEY LAUNDERING & MIRROR TRANSFERS

13.     Individuals and organizations at the nexus of these needs meet them by taking possession of drug profits in the United States, including those obtained from the sale of cocaine, and: (1) transmitting them in a manner designed to cause an equivalent amount of currency to be arrive in bank accounts in China[1]; or (2) by using the cash to purchase U.S. goods that are subsequently shipped to China for re-sale. In either case, affirmation that the cash changed hands in the United States—from "dealers" to "launderers"— triggers the release of funds in the location where they are required. For the purposes of this Indictment, this exchange is known as a "mirror transfer." Once the proceeds are received in China, they are used to finance the purchase of Chinese goods. Merchants in Latin American countries, including Mexico, seek the services of "brokers" capable of obtaining RMB to finance the purchase of Chinese merchandise. Once purchased, this merchandise is shipped to the Latin American merchant, including those in Mexico, who sells it for profit through apparently legitimate businesses. This cycle exists to the mutual benefit of all involved.

14.     The individuals responsible for arranging these transactions are compensated on the basis of their success in organizing and executing the transactions and the amount of money involved. It is thus common that individuals engaged in the business of moving money in this or similar fashion forge connections with Latin American DTOs to obtain as many "contracts" as possible, thereby maximizing their personal profits through "commissions." It follows that these

---

[1] For purposes of this Indictment, China is understood to include Hong Kong.

4

individuals, along with their co-conspirators, rely on and seek to further the continued success of the cocaine trade in the United States.

15.     For the purpose of this Indictment, a "contract" is an agreement to obtain money already in the United States and conduct financial transactions with that money so it, or its equivalent value, can be provided to individuals and groups whose activities generated it. Relatedly, a "commission" is a percentage of the money involved in the transaction.

## THE SCHEME

16.     XIZHI LI, JIANXING CHEN, GEORGE SHAO MIN YU, and others, both known and unknown to the Grand Jury, are joined to an organization of individuals in the United States, Mexico, Belize, Guatemala, China, and elsewhere, who conduct financial transactions with proceeds derived from the unlawful sale of controlled substances, including cocaine.  The transactions were designed to conceal the nature, location, source, ownership, and control of the proceeds so that they could be provided to individuals and organizations responsible for trafficking cocaine into the United States.  The conspirators' ultimate goal was to enrich themselves to the greatest extent possible by conducting these transactions.

17.     The defendants cultivated relationships with numerous DTOs and individuals affiliated with these DTOs to obtain as many "contracts" as possible to maximize the value of their "commissions."

18.     The conspiracy included and utilized individuals in the United States who obtained cash from individuals associated with drug traffickers.  These individuals would validate their ability to collect the requested funds by presenting a verification code, which often included a serial number taken from U.S. or foreign currency.

19.     The conspiracy used other secretive and clandestine methods to accomplish its
goals. For example:

    a.   it was common for an individual involved in this conspiracy to transport drug
proceeds across the United States so they could be further transacted by the
defendants and/or their co-conspirators several states removed from where the
proceeds were generated;

    b.   the defendants used encrypted communications platforms to discuss their illegal
activities including, but not limited to, cellular telephone applications known as
"WeChat" and "WhatsApp";

    c.   the defendants used bank accounts in the United States, China, and elsewhere to
deposit and conduct financial transactions with drug proceeds, including those
derived from the sale of cocaine.  Some of these accounts were obtained by the
defendants under false identities;

    d.   the defendants used businesses in the United States and abroad as a means to
conceal the money they were receiving.

20.     The defendants and their co-conspirators performed various tasks and took on
various roles in furtherance of the conspiracy.  For example:

    a.   XIZHI LI (hereafter "LI"), was born in China but is believed to reside primarily in
Mexico. He forged close ties with drug traffickers and DTOs in Mexico, Colombia,
Guatemala, and elsewhere, to obtain contracts to conduct financial transactions
with their United States-based proceeds.  LI worked with numerous individuals in
the United States to organize the movement of drug proceeds.  LI utilized several
fictitious identities in connection with his criminal activities including, but not

limited to, the alias "Francisco Ley Tan." LI used this identity to obtain bank accounts in Miami, Florida, and to purchase a casino in Guatemala City, Guatemala. LI used the casino to further his drug trafficking and money laundering schemes. LI also used the WeChat screennames "SUPERKING 99" and "JL 007," among others, in connection with his criminal activities.

b. JIANXING CHEN (hereafter "CHEN"), was born in China but is believed to reside primarily in Belize. CHEN and LI worked together to forge connections with drug traffickers in Mexico, Colombia, Guatemala, and elsewhere. CHEN had a financial and management interest in LI's casino in Guatemala City. Like LI, CHEN used the casino as part of, and to further, his criminal activities. CHEN traveled to New York City, Los Angeles, Cancun, Guatemala City, and elsewhere, in connection with his criminal activities. CHEN would often direct others to collect and transport drug trafficking proceeds so that they could be used in subsequent financial transactions. Some of these proceeds were collected in and transited through the Eastern District of Virginia. CHEN used encrypted communications including, but not limited to, WhatsApp in connection with his criminal activities.

c. GEORGE SHAO MIN YU (hereafter "YU"), is a U.S. citizen believed to reside in California. YU conducted financial transactions involving drug proceeds, including those derived from the sale of cocaine. Among his activities, YU, at the direction of LI and others, collected drug proceeds and transported them across the country. YU used rented vehicles in connection with his criminal activity. YU also used third parties to conduct financial transactions in furtherance of this conspiracy.

At times, and as part of this conspiracy, YU obtained large scale quantities of cocaine that were distributed throughout the United States.

21.    From at least 2008 and continuing up to and through the date of this Indictment, the defendants, together with co-conspirators known and unknown to the Grand Jury, transacted millions of dollars derived from the importation and distribution of drugs, primarily cocaine, in the United States.

## COUNT ONE
(Conspiracy to Distribute Five Kilograms or more of Cocaine)

THE GRAND JURY FURTHER CHARGES THAT:

22.    The factual allegations contained in Paragraphs 1 through 21 are re-alleged and incorporated as if set forth here in their entirety.

## STATUTORY ALLEGATION

23.    From in and around 2008 and continuing thereafter up to and including the date of this Indictment, the exact dates being unknown to the Grand Jury, within the Eastern District of Virginia, and elsewhere, the defendants XIHZI LI, JIANXING CHEN, and GEORGE SHAO MIN YU, did knowingly and intentionally combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to knowingly and intentionally distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).

## OBJECT OF THE CONSPIRACY

24.    The object of the conspiracy was to distribute narcotics. The defendants sought to facilitate the success of DTOs who imported and distributed drugs, including cocaine, in the United States. The defendants did this by conducting financial transactions with the proceeds derived from the illegal sale of drugs, including cocaine. These transactions were designed, at least in part,

to conceal the nature, location, source, ownership, and control of the involved funds. The defendants profited through commissions based on the amount of money involved in each financial transaction. These commissions came directly and indirectly from the DTOs with whom they conspired. The defendants and their co-conspirators used the following ways, manners, and means among others, to carry out this purpose:

## WAYS, MANNERS, AND MEANS

### FRANCISCO LEY TAN, THE CASINO, AND THE BBVA COMPASS ACCOUNTS

25.   It was part of the conspiracy that LI used several aliases, including but not limited to the name "Francisco Ley Tan."

26.   It was further part of the conspiracy that LI owned and operated a casino in Guatemala City, Guatemala, associated with the business names "MGM Diamond Group" and later "MGM Golden Group." The registered agent for this business was "Francisco Ley Tan." At times during the conspiracy, CHEN aided LI in operating the casino.

27.   It was further part of the conspiracy that LI, CHEN, and their co-conspirators, both known and unknown to the Grand Jury, would use the casino to further their drug-trafficking activities. This included using the casino to arrange meetings with drug traffickers.

28.   It was further part of the conspiracy that LI operated bank accounts with BBVA Compass in Miami, Florida, including, but not limited to, accounts ending in 7573, 2366, and 8084, all of which were registered to Francisco Ley Tan at 1450 Brickell Ave, Suite 2000, Miami, Florida 33131. This address was BBVA Compass's corporate address in Miami.

### CROSS-COUNTRY "PICKUPS" AND DELIVERIES, THE SERIAL CODE, AND "MIRROR TRANSFERS"

29.   It was further part of the conspiracy that the defendants and their co-conspirators traveled to various locations throughout the United States, including the Eastern District of

Virginia, to collect and cause the collection of proceeds derived from drug trafficking. The defendants and their co-conspirators would also transport and cause the transportation of kilograms-quantities of cocaine across the United States.

30.     It was further part of the conspiracy that the defendants would present a verification code when they arrived at locations where drug proceeds, including cocaine proceeds, were stored. That code typically included the serial number from U.S. or foreign currency. The defendants would often send or receive electronic messages containing images of currency displaying the serial number.

31.     It was further part of the conspiracy that upon verifying that the defendants or their co-conspirators were authorized to obtain the cocaine proceeds, that currency of equivalent value would be released in a requested location. This currency would be provided to a drug trafficker or representative of a DTO to whom the money was owed, thus completing the "mirror transfer" process.

32.     It was further part of the conspiracy that if law enforcement seized proceeds that were to be used in the "mirror transfer," the defendants and their co-conspirators were obliged to re-pay that money to the DTOs. Re-payment often came in the form of either direct cash compensation, or by moving a DTO's money without receiving a commission.

*USE OF CHINESE BANK ACCOUNTS*

33.     It was further part of the conspiracy that the defendants and their co-conspirators, both known and unknown, controlled or had access to accounts with Chinese financial institutions, including but not limited to the Agricultural Bank of China and the Industrial and Commercial Bank of China. These accounts were used to receive and transact money derived from drug sales, including the sale of cocaine, in the United States.

(All in violation of 21 U.S.C. § 846).

## COUNT TWO
(Conspiracy to Distribute Five Kilograms or More of Cocaine Knowing
and Intending that it would be Unlawfully Imported into the United States)

THE GRAND JURY FURTHER CHARGES THAT:

34.    The factual allegations contained in Paragraphs 1 through 21 are re-alleged and

incorporated as if set forth here in their entirety.

## STATUTORY ALLEGATION

35.    From in and around 2008 and continuing thereafter up to and including the date of

this Indictment, the exact dates being unknown to the Grand Jury, within the jurisdiction of the

United States and in an offense begun and committed outside the jurisdiction of a particular State

or district, including in Mexico, Colombia, Guatemala, Belize, China, and the United States, and

elsewhere, the defendants XIZHI LI and JIANXING CHEN, who will be first brought to the

Eastern District of Virginia, and GEORGE SHAO MIN YU, who will be first brought to the

Eastern District of Virginia and whose joint offenders will be first brought to the Eastern District

of Virginia, did knowingly and intentionally combine, conspire, confederate, and agree with

others, known and unknown to the Grand Jury, to knowingly and intentionally distribute five

kilograms or more of a mixture and substance containing a detectable amount of cocaine, a

Schedule II controlled substance, knowing and intending that such substance would be unlawfully

imported into the United States, in violation of 21 U.S.C.§§§ 959(a), 960(a), and 963, and 18

U.S.C. § 3238.

## OBJECT OF THE CONSPIRACY

36.    The object of the conspiracy was to distribute narcotics knowing and intending that

it would be unlawfully imported into the United States.  The defendants sought to facilitate the

success of DTOs who imported and distributed drugs, including cocaine, in the United States. The defendants did this by conducting financial transactions with the proceeds derived from the illegal sale of drugs, including cocaine. These transactions were designed, at least in part, to conceal the nature, location, source, ownership, and control of the involved funds. The defendants profited through commissions based on the amount of money involved in each financial transaction. These commissions came directly and indirectly from the DTOs with whom they conspired. The defendants and their co-conspirators used the following ways, manners, and means among others, to carry out this purpose:

### WAYS, MANNER, AND MEANS

37.     The allegations set forth in Paragraphs 25 through 33 are re-alleged and incorporated as if set forth her in their entirety to describe the ways, manner, and means of the conspiracy.

(All in violation of 21 U.S.C. § 963)

### COUNT THREE
(Money Laundering Conspiracy)

THE GRAND JURY FURTHER CHARGES THAT:

38.     The factual allegations contained in Paragraphs 1 through 21 are re-alleged and incorporated as if set forth here in their entirety.

### STATUTORY ALLEGATION

39.     Beginning in and around 2008, and continuing until at least in and around the date of this Indictment, the exact dates being unknown to the Grand Jury, within the Eastern District of Virginia, and elsewhere, the defendants XIHZI LI, JIANXING CHEN, and GEORGE SHAO MIN YU, did knowingly and intentionally combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit an offense against the United States in

violation of Title 18, United States Code, Section 1956, to wit:

a.    to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, conspiracy to distribute controlled substances as alleged in Count One and conspiracy to distribute controlled substances knowing and intending that they would be unlawfully imported as alleged in Count Two of this Indictment, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, that is, the conspiracies as alleged in Counts One and Two, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

b.    to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds involving the proceeds of specified unlawful activity, that is, conspiracy to distribute controlled substances as alleged in Count One and conspiracy to distribute controlled substances knowing and intending that they would be unlawfully imported as alleged in Count Two of this Indictment, from a place in the United States to and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i);

## OBJECT OF THE CONSPIRACY

40.     The object of the conspiracy was to conduct financial transactions with the proceeds derived from the illegal sale of drugs, including cocaine.   These transactions were designed, at least in part, to conceal the nature, location, source, ownership, and control of the involved funds. The defendants profited through commissions based on the amount of money involved in each financial transaction.   These commissions came directly and indirectly from the DTOs with whom they conspired.   The defendants facilitated the continued success of DTOs who imported and distributed drugs, including cocaine, in the United States.   The defendants and their co-conspirators used the following ways, manners, and means among others, to carry out this purpose:

## WAYS, MANNER, AND MEANS

41.     The ways, manner, and means of the conspiracy charged in Paragraphs 25 through 33 of Count One are re-alleged and incorporated as if set forth here in their entirety to describe the ways, manner, and means of the conspiracy charged in Count Three.

(All in violation of 18 U.S.C. § 1956(h)).

## FORFEITURE NOTICE

THE GRAND JURY HEREBY FINDS probable cause that the property described in this NOTICE OF FORFEITURE is subject to forfeiture pursuant to the statutes described herein. Pursuant to Fed.R.Crim.P. 32.2(a), the defendants, are hereby notified that if convicted of Counts One and Two of this Indictment, they shall forfeit to the United States, pursuant to 21 U.S.C.§§ 853(a) and 970, any property constituting, or derived from, any proceeds each defendant obtained, directly or indirectly, as the result of such violation; and any of the defendant's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

If convicted of Count Three of this Indictment, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) all property, real or personal, involved in the offense and any property traceable thereto. The property subject to forfeiture includes at least:

a. $30 million in United States currency representing proceeds the defendants obtained in the course of the drug conspiracies and property involved in the money laundering conspiracy, as alleged in this Indictment;

b. A BBVA Compass Bank Account ending in 8084, and its contents;

c. $617,524.24, that was seized on February 22, 2018, from BBVA Account ending in 8084;

d. A BBVA Compass Bank Account ending in 7573, and its contents;

e. A BBVA Compass Bank Account ending in 2366, and its contents;

f. A Bank of America Bank Account ending in 1589, and its contents;

If any of the above-described forfeitable property, as a result of any act or omission of the

defendants:

    a.  Cannot be located upon the exercise of due diligence;

    b.  Has been transferred or sold to, or deposited with, a third party;

    c.  Has been placed beyond the jurisdiction of the Court;

    d.  Has been substantially diminished in value; or

    e.  Has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), and as incorporated by 18 U.S.C. § 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of forfeitable property described in this forfeiture allegation.

    (Pursuant to 18 U.S.C. § 982 and 21 U.S.C. §§ 853 & 970 and Fed.R.Crim.P.32.2).

A TRUE BILL

Pursuant to the E-Government Act,,
The original of this page has been filed
under seal in the Clerk's Office

Foreperson

    G. Zachary Terwilliger
    United States Attorney

By: _____

    David A. Peters
    Michael P. Ben'Ary
    Assistant United States Attorneys


    Deborah Connor
    Chief, Money Laundering and Asset Recovery Section
    U.S. Department of Justice, Criminal Division

By: _____

    Kerry Blackburn
    Stephen Sola
    Trial Attorneys