

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:19-CR-334 |
| XIZHI LI, | Hon. Leonie M. Brinkema |
| Defendant. | |

STATEMENT OF FACTS

The United States and the Defendant, XIZHI LI (hereafter "LI"), stipulate that the allegations in the indictment and the following facts are true and correct, and that had the matter gone to trial, the United States would have proven the following facts beyond a reasonable doubt:

1. From in and around 2008 and continuing through in and around December 2019, within the Eastern District of Virginia, and elsewhere, the defendant XIZHI LI, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit an offense against the United States, in violation 18 U.S.C. § 1956, to wit: to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, conspiracy to distribute controlled substances, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h).

2. LI occupied a leadership and management position within a conspiracy whose membership, at various times, included Jianxing Chen (J.Chen), George Shao Min Yu (Yu), Qiyun Chen (Q. Chen), Xueyong Wu (Wu), Jingyuan Li (J.Li) and others. The purpose of this organization was to help foreign drug-trafficking organizations (DTOs) gather, launder, and repatriate proceeds derived from the DTOs unlawful drug trafficking activities in the United States. Those drug trafficking activities primarily involved cocaine.

3. LI and his co-conspirators cultivated relationships with DTOs to obtain as many "contracts" as possible to move and launder United States-based cocaine proceeds. LI and his co-conspirators received a "commission" for arranging these transactions, which represented a percentage of the involved funds.

4. LI used secretive and clandestine means to facilitate the movement of cocaine proceeds within the United States and abroad. For example:

   a. LI arranged for individuals to transport drug proceeds across the United States so that additional money-laundering transactions could be conducted by further individuals several states away from where the proceeds were generated;

   b. LI and his co-conspirators operated or had access to bank accounts in the United States, China, Mexico, and elsewhere. Some of these accounts were operated under the names of fictitious identities. LI used or directed others to use these accounts to deposit and conduct financial transactions with drug proceeds. This included transmitting the proceeds to accounts in China where the money was used to purchase Chinese goods. It also included using the funds to purchase consumer goods in the United States that were ultimately shipped to China for resale. Successful completion of these transactions generated Chinese currency

2

known as renminbi (RMB). Merchants in Latin America seeking to import goods from China purchased RMB from LI and his co-conspirators using the local currency of the Latin-American country. These merchants used the RMB they bought from LI to purchase goods in China and import them into Latin-American countries. Acquisition of the Latin-American currencies, often Mexican pesos, enabled LI to provide the DTOs with their drug proceeds in the currency used in their home countries which disguised the illegal nature and source of the funds used by the DTOs.

c. LI used encrypted communications platforms including WhatsApp and WeChat. LI used WeChat screennames, including "SUPERKING 99" and "JL007", in connection with his criminal activities.

d. LI obtained numerous fictitious identities to facilitate this criminal scheme. Among them was the identity "Francisco Ley Tan."

e. LI maintained businesses in Mexico and the United States associated with the name "Lucky City." LI used these businesses, at least in part, to facilitate his money laundering activities.

5. LI's money laundering activities, and those of his co-conspirators, were integral to the success of foreign DTOs. LI often dealt directly with members of DTOs or their representatives to obtain and service "contracts" to move the DTOs United States-based cocaine proceeds.

6. Starting in at least 2014, LI worked with an individual known as cooperating source 1 (CS-1), Q.Chen, J.Li and others to launder drug money on behalf of DTOs. At times, LI and his co-conspirators used a seafood import/export business known as Shuoyu, USA, Inc. ("Shuoyu") as part of their scheme. Specifically, they used the business to purchase seafood using the

3

proceeds of illicit drug sales in the United States to purchase seafood products that were later exported for sale in other countries, including China and Hong Kong. Through their combined efforts and methods, including the use of Shuoyu, LI and his conspirators laundered at least $10,000,000 of drug proceeds.

7. LI used casinos to facilitate meetings with leaders and representatives of foreign DTOs. Specifically, LI owned and operated a casino in Guatemala City, Guatemala, associated with businesses known as "MGM Diamond Group" and "MGM Golden Group." LI obtained and operated these businesses using the fictitious "Francisco Ley Tan" identity.

8. During the relevant period, both Wu and J.Chen assisted LI in operating this casino.

9. LI obtained bank accounts in the United States, in part, to conceal the nature, location, source, ownership, and control of money derived from the unlawful sale of drugs. Specifically, LI obtained accounts with BBVA Compass Bank in Miami, Florida, using the "Francisco Ley Tan" identity.

10. Between February and March 2016, Yu made at least four trips between Los Angeles and Chicago on behalf of LI. The purpose of these trips was to obtain and transport bulk cash generated by the sale of drugs. Each trip involved at least $300,000. On or about March 11, 2016, Yu was detained by law enforcement in Seward County, Nebraska, while transporting approximately $340,000 to Los Angeles. This money was the proceeds of drug sales in the United States. Law enforcement seized the money from Yu (although it was returned to Yu at a later date). At the time of his arrest, Yu was in the process of transporting this money to Los Angeles on LI's behalf.

11. Shortly thereafter, Yu contacted LI to inform him the money had been seized. LI eventually informed Yu that he (LI) would re-pay the DTO for the lost money. LI also

eventually instructed Yu to repay him (LI) by sending money to one of LI's BBVA Compass accounts in Miami, which Yu did through third-party depositors.

12. Beginning in at least 2016, LI arranged to transport and launder drug proceeds in the United States with Q.Chen, J.Chen, and others. J.Chen employed several couriers whose job was to conduct money pickups in the United States of funds owed to foreign DTOs.

13. One such courier was an individual hereafter known as cooperating source-2 (CS-2). Throughout at least 2016 and 2017, CS-2 picked up money derived from the unlawful sale of cocaine throughout the United States including Virginia Beach, Virginia, located within the Eastern District of Virginia. During this same period, CS-2 traveled through the Eastern District of Virginia to obtain and transport cocaine proceeds.

14. CS-2 maintained ledgers detailing his bulk cash smuggling and money laundering activities. These ledgers account for at least $4,000,000 of laundered drug proceeds.

15. LI was in custody at the Alexandria, Virginia, Adult Detention Center ("ADC") throughout 2020 awaiting trial. At some point in 2020, while at the ADC, LI directed Wu to pass a message Yu instructing Yu to lie to law enforcement about the nature of the money he re-paid to LI's BBVA Compass account following his arrest in March 2016.

16. The acts described above were done willfully and knowingly and with the specific intent to violate the law, and not by accident, mistake, inadvertence, or other innocent reason. This statement of fact does not contain each and every fact known to the defendant and to the United States, and it is not intended to be a full enumeration of all the facts surrounding the defendant's charges.

17. The defendant waives any rights that the defendant may have under Fed. R. Civ. P. 11(f), Fed. R. Evid. 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any proceeding.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

Date: 7/30/21

By: _____
David A. Peters
Assistant United States Attorneys
Eastern District of Virginia
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel.: (703)-299-3700

Deborah Connor
Chief, Money Laundering and Asset Recovery
Section, U.S. Department of Justice, Criminal
Division

_____
Kerry Blackburn
Mary Daly
Trial Attorneys

### Defendant's Stipulation and Signature

After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that if the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 7/29/21

Xizhi Li,
Defendant

### Defense Counsel's Signature

I am the attorney for Defendant in this case, Xizhi Li. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is informed and voluntary.

Date: 7/29/21

Gregory English, Esq.
Counsel for Defendant

7